UNITED STATES of America ex rel. John W. FLEMINGS, Plaintiff,

v.

Hon. John H. CHAFEE, Secretary of the Navy, Defendant.

No. 70–C–1267.

United States District Court, E. D. New York.

July 19, 1971.

Edward R. Neaher, U. S. Atty. for the Eastern District of New York, United States District Court, Brooklyn, N. Y., for defendant; Bruce F. Smith, Wethersfield, Conn., of counsel.

Michael Meltsner, New York City, for plaintiff.

MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This is an action to overturn a 1944 court-martial conviction for automobile theft and to compel the correction of military records from a dishonorable discharge to a general discharge under honorable conditions. Both parties have moved for summary judgment. Since the crime was not service related, the court-martial had no jurisdiction, the conviction was void, and the discharge records must be corrected.

## I. FACTS

The material facts are undisputed. In August, 1944, plaintiff, then eighteen years old, was a seaman second class in the United States Naval Reserve. He was granted permission to leave his base, the Naval Ammunition Depot, Earle, New Jersey, for 72 hours but failed to return on time. While absent without official leave, he was arrested for automobile theft by Pennsylvania State Troopers near Hallidaysburg, Pennsylvania.

Transferred to military custody, plaintiff was incarcerated at Harts Island, New York. Court-martial proceedings were held at the Brooklyn Navy Yard before a court of retired senior naval officers. On advice of military counsel, he pled guilty to the charges of automobile theft and of being absent without leave for thirteen days. He was sentenced to three years incarceration, loss of pay and a dishonorable discharge. The maximum punishment at that time for a two week unauthorized absence was confinement for six months plus the period of absence, loss of all pay and allowances during a like period, reduction to the lowest enlisted pay grade, and a bad conduct discharge. After 26 months of confinement, during which he was repeatedly disciplined for infractions, plaintiff was released and dishonorably discharged.

The automobile had been stolen while it was parked on a street in Trenton, New Jersey, the day before plaintiff was arrested. The owner, a member of the United States Signal Corps, did not witness the theft; he lived off base and received no compensation from the military for the car's use. He was on a personal errand in Trenton when the vehicle was stolen. The court-martial specification itself charges plaintiff with stealing an automobile "from the possession of a civilian."

Plaintiff alleges that he had been hitchhiking—in civilian clothes according to his own supplemental affidavit—when he was picked up by another sailor in the automobile; that he was merely a passenger; and that he was not aware that it was stolen. According to him, the driver stopped beside the highway to visit a friend in a nearby farmhouse. While plaintiff was waiting in the car the arresting state troopers stopped to investigate. He alleges that as they talked with him the troopers saw the other sailor running away. It is his contention that his version of the story was corroborated by the state troopers' interview of a gas station attendant shortly after the arrest.

Both parties agree that all administrative remedies have been exhausted. The Judge Advocate General has ruled that no action to modify the sentence is warranted. The Board for Correction of Naval Records has denied plaintiff's request for reconsideration of his application for correction of his military records. The case is ripe for adjudication.

Defendant does not now contest this Court's jurisdiction to review the refusal of the Board for Correction of Naval Records to grant the petition for a change in the form of plaintiff's discharge. 28 U.S.C. § 1361; Ashe v. McNamara, 355 F.2d 277, 282 (1st Cir. 1965). Cf. Smith v. Resor, 406 F.2d 141, 146–147 (2d Cir. 1969).

## II. VENUE

Though not raised in the answer, lack of venue has been asserted in a subsequent motion to dismiss.

Venue is properly laid, among other places, in the judicial district where the "cause of action arose." 28 U.S.C. § 1391(e). The "cause of action" in this case may, as defendant asserts, have arisen in Washington, D. C., the district where the Board for the Correction of Naval Records refused to grant plaintiff's petition; but it also had its roots in this district where the court-martial proceeding was held. The cause of action for venue purposes can be said to arise wherever substantial material events took place. Cf. Alameda Oil Com-

pany v. Ideal Basic Indus., Inc., 313 F. Supp. 164, 168–169 (W.D.Mo.1970).

■ In any event, defendant waived the objection by failing to raise the venue issue in its answer or by pre-pleading motion. Fed.R.Civ.P. 12(b) (h); Concession Consultants, Inc. v. Mirisch, 355 F.2d 369, 371 (2d Cir. 1966); United Rubber C., L. & P. W., Local 102 v. Lee Rubber & Tire Corp., 269 F.Supp. 708, 713–714 (D.N.J.1967), aff'd, 394 F.2d 362, cert. denied, 393 U.S. 835, 89 S.Ct. 108, 21 L.Ed.2d 105 (1968); 1 J. Moore, Federal Practice ¶ 0.146 [1] [6] (1964).

## III. CONTENTIONS OF PARTIES

Plaintiff's legal and factual submission can be summarized in the following syllogism:

1. A court without subject matter jurisdiction has no power to affect the status of a person before it because its purported decisions are void.

2. The court-martial had, under the holding of *O'Callahan* v. *Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), no subject matter jurisdiction.

3. The court-martial's decision that he was guilty of automobile theft was void and the dishonorable discharge predicated upon this decision must be set aside.

The government's response is:

1. When the Supreme Court spoke of lack of jurisdiction in *O'Callahan* it did not mean lack of power over the subject matter, or, if it did,

2. *O'Callahan*, as interpreted in *Relford* v. *Commandant, U. S. Disc. Barracks, Ft. Leavenworth*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), does not exclude a case such as plaintiff's from court-martial jurisdiction, or, if it does,

3. *O'Callahan* may not be applied to court-martial convictions which became final before 1969.

## IV. JURISDICTION RATONALE OF O'CALLAHAN

■ The adjudicatory power of a court is called its jurisdiction. The term, in its primary sense, signifies power to speak the law by applying it to particular cases. If a body lacks jurisdiction over the subject matter or the parties its purported judgments are void. Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1879); McClaughry v. Deming, 186 U. S. 49, 22 S.Ct. 786, 46 L.Ed. 1049 (1902); Rosenberg et al., Elements of Civil Procedure, 143–145 (1970); Restatement (Second), Conflict of Laws, chap. 3, Introductory Note (c), 127–128 (P.O.D. Draft, Part 1, May 2, 1967) ("competence"). In recent years the term has acquired a secondary meaning: courts have been said to lack jurisdiction not because they lacked adjudicatory power but because they failed to exercise their power in a proper manner. *See, e. g.*, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (right to counsel).

In criminal law this second usage has expanded greatly, in part because the remedy of habeas corpus was originally based on lack of jurisdiction. *See* Developments in the Law, Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1045–1055, 1209–1216 (1970). As habeas corpus was increasingly used to collaterally attack state and federal convictions on the ground of unconstitutional procedures leading to conviction, much of the new criminal constitutional law took on a jurisdictional cast. This new usage included such diverse matters as the right to counsel, to suppress illegally obtained evidence, to a jury trial and to confrontation.

Lack of precision in the use of the word "jurisdiction" creates part of the difficulty with retroactivity which is discussed in VI, *infra*. Use of the word "competence" when lack of adjudicatory power is meant, as suggested in the Restatement of Conflicts, Second, *supra*, would avoid some of the confusion but this terminology has not yet been adopted by the Supreme Court.

In analyzing the retroactivity problem some have suggested that the limitations on the exercise of court-martial power in *O'Callahan* were "function-

al" rather than "jurisdictional"—that is to say, the decision was based on procedural deficiencies rather than lack of power. *See, e. g.,* Schlomann v. Moseley, No. L–1003, p. 2 (D.C.Kansas, May 19 1970); United States v. King, A.C.M. 20361 (July 30, 1969). The language of the Supreme Court makes that conclusion doubtful.

*O'Callahan* involved a habeas corpus proceeding challenging the jurisdiction of a court-martial to try a soldier who assaulted a girl on private property while he was on leave and in civilian clothes. The grant of certiorari was ambiguous in its use of the term jurisdiction, since the question posed was:

> "Does a court-martial * * * have jurisdiction * * * thus depriving him of his constitutional rights to indictment by a grand jury and trial by a petit jury in a civilian court?" 393 U.S. 822, 89 S.Ct. 177, 21 L.Ed.2d 93 (1968).

It is not clear that the question was whether the court-martial lacked power over the subject matter and person of the soldier before it because this type of case should go to a different kind of court (classic competence jurisdiction) or whether denial of the right to a grand and petit jury without waiver caused potential jurisdiction to be lost (procedural-constitutional jurisdiction).

The majority opinion is not completely lucid on the point, but a fair reading suggests that it used the phrase lack of jurisdiction to mean lack of power over the subject matter. Its major thrust is directed to the basic differences between *systems* of military and civilian courts rather than to a few defects of procedure. For example, the court speaks of "development of a system of military justice with fundamental differences from the practices in the civilian courts." O'Callahan v. Parker, 395 U.S. 258, 262, 89 S.Ct. 1683, 1685, 23 L.Ed.2d 291 (1969). The lack of juries is relied upon primarily as an illustration of these "fundamental differences." The court quoted at length from its own decision in *United States ex rel. Toth* v. *Quarles,* 350 U.S. 11, 17–18, 76 S.Ct. 1, 5–6, 100 L.Ed. 8 (1955), to further demonstrate such differences with respect to tenure of judges and command influence. *Id.* at 262–264, 89 S.Ct. at 1685–1686. It also relied on differences in the access of the defense to compulsory process. *Id.* at 264, n. 4, 89 S.Ct. at 1686. Differences in evidence and procedure were noted. *Id.* at 264, 89 S.Ct. at 1686.

Repeatedly the majority's use of the term jurisdiction, in context, denotes lack of power over the subject matter or person. For example, it pointed out that:

> "in examining the reach of [military court] jurisdiction, it has recognized that. * * * 'Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to '*the least possible power adequate to the end proposed.*' United States ex rel. Toth v. Quarles, 350 U.S. 11, 22–23, 76 S.Ct. 1, 8, 100 L.Ed. 8." *Id.* at 265, 89 S.Ct. at 1687 (emphasis in original).

The following quotations as well as the general tenor of the opinion are consistent with this primary usage:

> "The fact that courts-martial have no jurisdiction over nonsoldiers, whatever their offense, does not necessarily imply that they have unlimited jurisdiction over soldiers, regardless of the nature of the offenses charged." 395 U.S. at 267, 89 S.Ct. at 1688.

> " 'Status' is necessary for jurisdiction; but it does not follow that ascertainment of 'status' completes the inquiry, regardless of the nature, time, and place of the offense." *Id.*

> "The jurisdiction of British courts-martial over military offenses which were also common-law felonies was from time to time extended, but, with the exception of one year, there was never any general military jurisdiction to try soldiers for ordinary crimes committed in the British Isles." 395 U.S. at 269, 89 S.Ct. at 1689.

"In 1950, the Uniform Code of Military Justice extended military jurisdiction to capital crimes

\* \* \* \* \* \*

We have concluded that the crime to be under military jurisdiction must be service connected." *Id.* at 272, 89 S.Ct. at 1690.

The dissenting opinion is even more strongly pitched to the concept of jurisdiction as power to adjudicate. It deals with Congressional authority to grant jurisdiction to military courts. It rests its case on the proposition that "it is for Congress and not the Judiciary to determine the appropriate subject-matter jurisdiction of courts-martial." *Id.* at 276, 89 S.Ct. at 1692.

Until we are told otherwise by an appellate court we must assume that the Supreme Court used the term jurisdiction in *O'Callahan* in its classic sense to mean lack of competence to adjudicate particular categories of cases.

## V. SERVICE CONNECTION

█ In order for a military tribunal to obtain jurisdiction to try a serviceman the offense charged must be "service connected." O'Callahan v. Parker, 395 U.S. 258, 272, 89 S.Ct. 1683, 1690, 23 L.Ed.2d 291 (1969). Substituted for a "status" test—whether the defendant was a member of the Armed Forces—is what has been referred to as a "multi-factor" approach. Nelson and Westbrook, Court-Martial Jurisdiction Over Servicemen For "Civilian" Offenses: An Analysis Of O'Callahan v. Parker, 54 Minn.L.Rev. 1, 24–34 (1969). Although this approach may lead to a more just result, it has increased the difficulties in determining court-martial jurisdiction.

Cognizant of the confusion possible under *O'Callahan*, the Supreme Court in *Relford v. Commandant, U. S. Disc. Barracks, Ft. Leavenworth*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), enumerated twelve factors to be considered in deciding whether a particular crime by a serviceman is service connected. They are:

"1. The serviceman's proper absence from the base.

"2. The crime's commission away from the base.

"3. Its commission at a place not under military control.

"4. Its commission within our territorial limits and not in an occupied zone of a foreign country.

"5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

"6. The absence of any connection between the defendant's military duties and the crime.

"7. The victim's not being engaged in the performance of any duty relating to the military.

"8. The presence and availability of a civilian court in which the case can be prosecuted.

"9. The absence of any flouting of military authority.

"10. The absence of any threat to a military post.

"11. The absence of any violation of military property.

"12. The offense's being among those traditionally prosecuted in civilian courts." 401 U.S. at 365, 91 S.Ct. at 655.

In *Relford* elements 1, 2, 3, 7 and 10 favored court-martial jurisdiction as did the facts that the victims of the crimes were related to servicemen on the base and property properly on the base was used in perpetrating the crimes. The Court stressed the following interests pointing strongly to service connection:

"(a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. \* \* \*

"(b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. \* \* \*

"(c) The impact and adverse effect that a crime committed against a person or property on a military base,

thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission.

"(d) The conviction that Article I, § 8, Clause 14, vesting in the Congress the power 'To make Rules for the Government and Regulation of the land and naval Forces,' means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman-offender and turn him over to the civil authorities. The term 'Regulation' itself implies, for those appropriate cases, the power to try and to punish.

"(e) The distinct possibility that civil courts, particularly non federal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary problems within its own community. * * *

"(f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance.

"(g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. * * *

"(h) The mis-reading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. [and]

"(i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post." 401 U.S. at 367–369, 91 S.Ct. at 656–657.

■ None of these lettered interests are present in the case before us. Of the twelve factors enumerated in the Supreme Court's opinion in Relford, ten (2, 3, 4, 6, 7, 8, 9, 10, 11 and 12) clearly point away from courts-martial jurisdiction; only two—1 and 5—arguably support a finding of service connection: at the time the theft was committed plaintiff was absent without leave from his military base, and in 1944 the United States was engaged in a global war. In the circumstances of this case, neither of these two factors permits a finding of service connection.

Although the Court of Military Appeals has "tended to interpret *O'Callahan* somewhat narrowly," Note, 64 Nw.L.Rev. 930, 939 (1970), it has held that the fact that the accused was improperly absent from his military base at the time of the alleged offense does not confer jurisdiction on military tribunals. *See* United States v. Armes, 19 U.S.C.M.A. 15, 16, 41 C.M.R. 15, 16 (1969). Absence of plaintiff from his military base without leave did not confer court-martial jurisdiction, particularly since he left the base with the permission of his superiors.

That the offense was commited during World War II has more significance. A sailor imprisoned in a civilian jail awaiting trial in a civilian court is of no use to his military unit and his absence may seriously impair its fighting capacity. If he is under military custody, he can be permitted to continue to perform his duties. *See* O'Callahan v. Parker, 395 U.S. 278, 282–283, 89 S.Ct. 1683, 1696, 23 L.Ed.2d 291 (1969); Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 62, 219, n. 40 (1969).

The record does not support the inference that this plaintiff was so indispensable to his unit that civilian prosecution might have embarrassed the Navy. After his arrest he made no contribution to the war effort. He was held for trial far from his base and sentenced to confinement.

No special claim is made by the defendant under general war powers. We need not, therefore, consider that question in this case.

Two other factors that might provide a sufficient nexus to the military for court-martial jurisdiction are relied upon by the defendant, although they were not enumerated in *Relford*. First, plaintiff may have been in uniform at the time of the offense—though he denies this; second, the owner of the stolen car was a member of the Armed Forces.

In United States v. Armes, 19 U.S.M. C.A. 15, 41 C.M.R. 15 (1969), a case factually quite similar to this one, the United States Court of Military Appeals held that there was no basis for court-martial jurisdiction, even though the defendant was wearing his fatigue uniform when he stole the car, the victim was a retired army major, and the defendant was absent without leave from his base. *Id.* at 16. *Cf.* United States v. Cook, 19 U.S.C. M.A. 13, 14, 41 C.M.R. 13, 14 (1969) (dissenting opinion). In instances where the Court of Military Appeals has based court-martial jurisdiction upon the wearing of the uniform, its use has generally facilitated the crime. *See, e. g.,* United States v. Peak, 19 U.S.C. M.A. 19, 41 C.M.R. 19 (1969); United States v. Morisseau, 19 U.S.C.M.A. 17, 41 C.M.R. 17 (1969). Here there is no evidence that the plaintiff used his military uniform to facilitate the commission of the crime. The fact that the owner of the car was a member of the Armed Forces was a "happenstance" with "no military significance." United States v. Armes, 19 U.S.C.M.A. 15, 16, 41 C.M.R. 15, 16 (1969).

## VI. RETROACTIVITY

Defendant's claim that *O'Callahan* should not be applied retroactively is troublesome. The Supreme Court itself has prophecied in Delphic style:

"Some writers assert that the holding [in *O'Callahan*] must be applied retroactively. Others predict that it will not be so applied." Relford v. Commandant, U. S. Disc. Barracks, Ft. Leavenworth, 401 U.S. 355, 357, 91 S.Ct. 649, 651, 28 L.Ed.2d 102 (1971) (footnotes omitted).

Traditionally, a ruling that a court lacked jurisdiction (competence) to try a class of cases would be applied to all cases within the class, regardless of the stage of development of the litigation. Linkletter v. Walker, 381 U.S. 618, 628–629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965). This doctrine has roots deep in the history of English law. *Id.* at 622–624, 85 S.Ct. at 1734–1735. Its foundation rests on historical notions of courts as institutions and on ingrained conceptions of the judicial process as primarily law applying rather than law making. *See* Mishkin, Foreword: The High Court, The Great Writ, and The Due Process of Time and Law, 79 Harv.L. Rev. 56, 60–72 (1965). Although never completely descriptive of courts actual practice, these beliefs reflect practical and symbolic aspects of the workings of the American judicial system that have not lost their vitality.

Of late the Supreme Court has begun to depart from this tradition in applying new constitutional decisions controlling criminal procedure. In a limited number of instances the Court has refused to apply new rules retroactively, developing a doctrine of "prospective overruling" or "prospective limitation." *See generally* Mishkin, Foreword: The High Court, The Great Writ, and The Due Process of Time and Law, 79 Harv.L. Rev. 56 (1965); Schwartz, Retroactivity, Reliability, and Due Process: A Reply to Professor Mishkin, 33 U.Chi.L.Rev. 719 (1966); Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907 (1962).

The boundaries of the new principle are, as yet, unclear and its rationale has been only sketchily developed. As Mr. Justice Harlan noted, concurring in Williams v. United States, 401 U.S. 646, 676, 91 S.Ct. 1148, 1172, 28 L.Ed.2d 388 (1971):

"The upshot of this confluence of viewpoints was that the subsequent course

of *Linkletter* became almost as difficult to follow as the tracks of a beast of prey in search of his intended victim."

*See also* United States v. Armiento, 445 F.2d 869, 870, n. 2 (2d Cir. 1971) ("problems in the area of retroactive application of newly-announced constitutional rulings have not found automatic resolution," citing 1971 Supreme Court decisions). A review of the many opinions in the "retroactivity" decisions this term indicates that the Supreme Court has yet to give precise guidance to the lower federal courts enabling them to predict with any assurance which rulings will not be applied retroactively. *See* Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971); Williams v. United States (Elkanich v. United States), 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). *Linkletter*, itself, the first attempt to justify the doctrine in its full blown form, presaged its ad hoc nature when it declared the Supreme Court's power to rule prospectively "where the exigencies of the situation require." Linkletter v. Walker, 381 U.S. 618, 628, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965).

As suggested in Part IV, *supra*, much of the doctrine's popularity has been due to the fact that it enabled the Court to avoid a difficult dilemma. Treating new criminal procedural rulings as, in a sense, constitutional-jurisdictional reduced the conceptual awkwardness in allowing them to be enforced via habeas corpus. Yet, traditional applications of the concept of lack of jurisdiction would have released prisoners who were fairly tried without any of the gains in police deterrence sought from the new rules. Limiting retroactivity reduced the outcry over release of prisoners, making practicable changes by the Supreme Court in criminal procedures grown outrageously incongruent with constitutional premises. *See* Williams v. United States, 401 U.S. 646, 676, 91 S.Ct. 1148, 1172, 28

L.Ed.2d 388 (1971) (Harlan, J., concurring).

The mixture of theory and practical considerations in determining the extent to which new rules will be applied retroactively, particularly in this time of changing personnel and views on the Supreme Court, make reasonable predictions almost impossible. In such circumstances, bearing in mind that the traditional and standard rule is still one of retroactivity and that this is particularly true where jurisdiction in the sense of lack of power over the subject matter or person is involved, a *nisi prius* court should apply the traditional rule unless it is clear that the Supreme Court will not do so.

In *Relford*, the Court just this last term refused to decide the issue of retroactive application of *O'Callahan* though it had granted certiorari on the point. Relford v. Commandant, U. S. Disc. Barracks, Ft. Leavenworth, 397 U.S. 934, 90 S.Ct. 958, 25 L.Ed.2d 114 (1970), 401 U.S. 355, 359, 91 S.Ct. 649, 652, 28 L.Ed.2d 102 (1971). In such circumstances the "task of declaring a rule's retrospective effect is better left to the only body that can speak with authority"—a higher court. Knight v. New York, 443 F.2d 415 (2d Cir. 1971).

■ Thus we apply *O'Callahan* retroactively—though with no abiding assurance of how appellate courts will treat the issue. We are mindful of the fact that other courts which have our greatest respect have taken a contrary position. *See* Thompson v. Parker, 308 F.Supp. 904 (M.D.Pa.1970) (dictum); Gosa v. Mayden, 305 F.Supp. 1186 (N.D.Fla. 1969); Schlomann v. Moseley, Civ.No. L–1003 (D.Kan. May 19, 1971); Mercer v. Dillon, 19 U.S.C.M.A. 264, 41 C.M.R. 264 (1970) (Ferguson, J., strongly dissenting at 268–274). Learned commentators are in disagreement on the point. *Compare* Nelson and Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn.L.Rev. 1, 39–46 (1969); Note, Court-Martial Ju-

risdiction Limited to "Service-Connected" Cases, 44 Tulane L.Rev. 417, 423–24 (1970); Comment, 21 S.C.L.Rev. 781, 793–794 (1969) *with* Note, 64 Nw.L.Rev. 931, 938 (1970); Comment, 22 Baylor L. Rev. 64, 75 (1970); Note, 9 Washburn L.J. 193 (1970).

The decisions and commentators prospectively applying *O'Callahan* have stressed the jury deprivation aspects of that decision; they analogize to the Supreme Court decision of DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968). *See* Thompson v. Parker, 308 F.Supp. 904, 908 (M.D.Pa. 1970); Mercer v. Dillon, 19 U.S.C.M.A. 264, 268, 41 C.M.R. 264, 268 (1970); Nelson and Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn.L.Rev. 1, 41 (1969); Note, Court-Martial Jurisdiction Limited to "Service-Connected" Cases, 44 Tulane L.Rev. 417, 423 (1970). Recognizing that bench trials were not necessarily less fair than jury trials, *De-Stefano* denied retroactive application to the newly established right of jury trial in serious state criminal prosecutions. DeStefano v. Woods, 392 U.S. 631, 633–634, 88 S.Ct. 2093, 2095, 20 L.Ed.2d 1308 (1968).

This seems too restrictive a reading of *O'Callahan*. The decision rested on concern about fundamental differences in the civil and military justice system. *See* Part IV, *supra*; Note, Loyola (LA) L.Rev. 188, 200 (1970); Note, 68 Mich. L.Rev. 1016, 1017 (1970); *Cf.* Comment, Colum.J. of Law & Social Problems, 278, 282–311 (1971). If this discrepancy is still serious today, after the institution of the Uniform Code of Military Justice, how much more so must it have been in 1944, when this defendant was court-martialed. As noted by Senator Sam J. Ervin:

"Prior to 1950 the American in uniform had been at the mercy of legal procedures little changed since before the Revolutionary War, procedures originally designed for mercenaries— not for citizen soldiers loath to give up the rights they were defending. So antiquated and unjust was the system that after World War II a great protest came from returning veterans demanding reforms which would guarantee to servicemen basic principles of due process of law." 115 Cong.Rec.S 6760–61 (Daily ed. June 19, 1969).

If we are correct in believing that the Court in *O'Callahan* meant incompetence to act when it referred to lack of jurisdiction, then it is quite unlike those cases in which retroactivity has been denied. Generally, prospectivity has been used when a court with apparent jurisdiction has utilized some procedure or evidence theretofore thought proper. *See, e. g.,* Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Tehan v. United States ex rel. Shott, 382 U. S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Johnson v. New Jersey, 384 U. S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). By contrast, the question of lack of subject matter jurisdiction has been considered unwaivable—to be raised at any point in the litigation and on the court's own motion. *See* State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530, 87 S.Ct. 1199, 1203, 18 L.Ed.2d 270 (1967); Capron v. Van Noorden, 6 U.S. (2 Cr.) 126 (1804); 1 J. Moore, Federal Practice ¶ 0.60 [4] (1964).

Even when civilian courts were loath to review any aspect of military adjudications, subject matter jurisdiction could be challenged in a collateral proceeding in the federal courts. *See, e. g.,* Hiatt v. Brown, 339 U.S. 103, 111, 70 S.Ct. 495, 498–499, 94 L.Ed. 691 (1950); McLaughry v. Deming, 186 U.S. 49, 22 S.Ct. 786, 46 L.Ed. 1049 (1902). In *Mc-Laughry* the Supreme Court sternly emphasized the importance of jurisdiction in approving the granting of a writ of habeas corpus after a court-martial conviction by a regular army court of a vol-

unteer. It declared that no waiver was possible:

"The law said such a court shall not be constituted, and the defendant cannot say it may, and consent to be tried by it, any more than he could consent to be tried by the first half a dozen private soldiers he should meet; and the decision of neither tribunal would be validated by the consent of the person submitting to such trial." 186 U.S. at 66, 22 S.Ct. at 793.

In light of this traditional approach to subject matter jurisdiction the prospective limitation cases dealing with newly determined procedural rights and evidentiary considerations do not provide compelling precedents.

Of the opinions considering the new doctrine, the one most in point is United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971). In *United States Coin* the government had brought an action for forfeiture of money allegedly used in illegal bookmaking operations. *See* 26 U.S.C.A. § 7302. Subsequently, the Supreme Court had voided the Internal Revenue laws that were the basis for the forfeiture. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). The Court held that the rationale of the earlier decisions precluded collection of the forfeiture and that they must be applied retroactively. Its reason for applying traditional notions of retroactivity was that

"even the use of impeccable factfinding procedures could not legitimate a verdict decreeing forfeiture, for we have held that the conduct being penalized is constitutionally immune from punishment." United States v. United States Coin and Currency, 401 U.S. 715, 724, 91 S.Ct. 1041, 1046, 28 L.Ed. 2d 434 (1971).

This concept is closely akin to subject matter jurisdiction. In *United States Coin* the conduct was immune from punishment in any court while in the in-

stant case the conduct was punishable but not in this particular court. Both cases involve the power—jurisdiction—to act.

We appreciate the force of the arguments that the military justifiably relied on the pre-*O'Callahan* interpretation of court-martial jurisdiction and that a traditional application of that opinion might have an adverse impact on the validity of hundreds of thousands of past court-martial sentences. *See* Thompson v. Parker, 308 F.Supp. 904, 908 (M. D.Pa.1970); Gosa v. Mayden, 305 F. Supp. 1186, 1187 (N.D.Fla.1969); Mercer v. Dillon, 19 U.S.C.M.A. 264, 266–67, 41 C.M.R. 264, 266–67 (1970); Schlomann v. Moseley, Civ.No.L–1003, pp. 3–4 (D.Kan. May 19, 1971). It is not clear how many men presently incarcerated are involved, but if they have been deprived of liberty by a body lacking power to do so, they should be released. Much of the administrative burden created by applications for more favorable forms of discharge may be handled by Congressional adoption of a short statute of limitations or by administrative remedies.

Even if we are mistaken and *O'Callahan* is a case based purely on denial of the right to jury trial, so that there is no retroactivity under *DeStefano*, it is arguable that an independent constitutional right—trial in the vicinage—has been denied to this plaintiff. This right has yet to be tested and he may raise it for the first time. This is not a problem of retrospectivity as in *Linkletter*, but one of first instance adjudication as in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *See* Comment, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907, 951 (1962).

Had plaintiff been tried in the civil courts in either New Jersey (where the automobile was stolen) or Pennsylvania (where it was driven), he would have been entitled to a trial in the vicinage. State v. Wyckoff, 31 N.J.L. 65, 68–69 (Sup.Ct.1864) ("The general rule of law has always been that a crime is to

be tried in the place in which the criminal act has been committed); State v. Brown, 1 N.J.Misc. 377, 378 (Sup.Ct. 1923) (There should be a strong reason presented to a court why * * * the indictment should be sent to another county for trial."); Pa.Const. Art. I, Sec. 9 ("In * * * criminal prosecutions the accused hath a right to * * a speedy public trial by an impartial jury of the vicinage."); Commonwealth v. Wojdakowski, 161 Pa.Super. 250, 53 A. 2d 851, 855 (Super.Ct.1947) ("The locus of crime is always an issue, for a court has no jurisdiction of the offense unless committed in the county where tried").

The right to be tried in the vicinage has been considered fundamental since Magna Charta. Magna Charta, paras. 17, 18 ("Assizes of novel disseisin, and of mort d'ancestor, and of darrien presentment, shall not be taken but in their proper counties. * * * "). The English practice of trying colonials in England was one of the grievances mentioned in the Declaration of Independence; one of the remonstrances against the King was his "transporting us beyond Seas to be tried for pretended offenses. * * " The right is mentioned both in Section 2 of Article III of the Constitution and in the Sixth Amendment.

The case before us demonstrates the worth of this right. Here the court-martial proceeding was held in the Brooklyn Navy Yard and plaintiff was incarcerated prior to trial on an island in Long Island Sound. How could he be expected to mount an adequate defense so many miles from the actual locus of the alleged crime in central New Jersey or Pennsylvania? Certainly distance complicated what was, in any event, a difficult task. This factor is especially important since the Pennsylvania State Troopers may have had exculpatory information.

## VII. CONCLUSION

Plaintiff's court-martial conviction for automobile theft must be vacated. His request that the Board for Correction of Naval Records be directed to grant him a general discharge under honorable conditions must be denied. The offense of being absent without leave in 1944 carried a permissible penalty of a bad conduct discharge. The matter is remanded to the Board with instructions to erase the conviction for automobile theft and the dishonorable discharge and to enter a discharge of no greater disapproval than bad conduct.

We would only add that the record of the plaintiff while incarcerated at Portsmouth should be read in light of the facts of his case. If, indeed, he was innocent of the crime charged in the court-martial some bitterness is perhaps understandable and may well have militated against "rehabilitation."

The Court appreciates the assistance of counsel, particularly Michael Meltsner, Esq., and his associates, who have prosecuted, without monetary compensation, various administrative appeals and this case after appointment by the Court.

So ordered.